UNITED STATES OF AMERICA,
Petitioner

v.

91.4 ACRES OF LAND, MORE OR LESS, IN ST. THOMAS, VIRGIN ISLANDS, and JOSE S. CID, et al., Claimants

U. S. Civil No. 37-1941

District Court of the Virgin Islands

Div. of St. Thomas and St. John at
Charlotte Amalie

May 23, 1942

**MOORE,** *Judge*

This is a condemnation proceeding, condemning 91.4 acres of land, more or less, on the island of St. Thomas, Virgin Islands of the United States. The said 91.4 acres of

land was (sic) divided into three parcels, to wit: A, B, and C. Parcel A consists of 41.4 acres and owned by defendant, Jose S. Cid; Parcel B consists of 26.4 acres and was owned by defendant, Herman O. Creque; Parcel C consists of 23.6 acres, and was also owned by defendant, Herman O. Creque. The location of each of these parcels is shown by the plat filed herein and known as Government Exhibit "A". The government filed its Declaration of Taking on June 14, 1941, and deposited in this court therewith the sum of $5,907.00 which was estimated as fair compensation for the said parcels as follows:

Parcel A ........................................ $2,906.00
Parcel B ........................................ 1,620.00
Parcel C ........................................ 1,380.00

and for the fee to the rights of way, roads or highways on the lands taken, the sum of one ($1.00) dollar.

The defendants herein were granted an extension of time for filing answer. Defendant, Jose S. Cid, filed his answer on October 27, 1941, and defendant, Herman O. Creque, filed his answer on November 10, 1941. The defendant, Jose S. Cid, alleged that the fair market value for the 41.4 acres, comprising Parcel A, was over $15,500.00, and that damage to the remaining portion of contiguous land not taken by the government was $4,480.00, which latter claim was waived. Defendant Herman O. Creque alleged in his answer that the fair market value of Parcels B and C, totalling 50 acres, was not less than $17,500.00.

In accordance with the statute of the Virgin Islands, the Court appointed three commissioners to take the evidence, to make their appraisement, and to file with this court a report of their appraisements. The appraisement report of the said commissioners was duly filed.

An appeal was taken from the award of the said commissioners to this court by the government, and in accordance with the statutes of this jurisdiction the case came before the Court for trial de novo. It was thereupon stipulated by and between the parties herein that the record of the evidence taken before the said commissioners should be submitted to the Court as the record to be considered in this case without recalling the said witnesses, and that such written objections as either side might wish to make, be submitted to any portion of the said evidence and record. Further, that either side should introduce such additional evidence as it may wish. The government filed herein its written objections to certain portions of the said record, which objections have been ruled upon by this court. The defendants filed no objections. One witness was recalled to testify in behalf of the government, and two additional witnesses were called to testify in behalf of the defendants herein; whereupon it was stipulated by and between the parties that if Mr. George H. T. Dudley and Dr. Rudolph U. Lanclos, co-commissioners appointed by this court to make their appraisement along with Mr. Ludvig Christensen, were called to testify, that the testimony of these two witnesses would be the same as that of the one witness called, to wit: Mr. Ludvig C. Christensen. Whereupon the entire matter was then submitted to this court for its decision.

### THE RECORD HEREIN SHOWS THE FOLLOWING

Witness Encarnacion Vasquez, called in behalf of the defendants, testified that about two months ago he sold 15.71 acres of land to the government; that the said land had about five to six acres in cultivation, and the rest in guinea grass; that the cultivation consisted of oranges,

bananas, and coffee. That the land is one or two miles away from the air field, across the island on top of the mountain; that it is not on the main road leading to the Bourne Field air base; that the road was rebuilt and hard-surfaced after the government purchased the land; that there are no riparian rights; that his land is about one and three-quarter times as far from the center of the town as the land in question herein; that the government paid him the sum of $3,200.00 which equals approximately $203.00 per acre.

Witness Herbert E. Lockhart, Realtor, called in behalf of the defendants, testified that about two and a half years ago he sold 236 acres of land to one Henry Molina for $11,800.00 which equals $50.00 per acre; that since that time he has had another portion of this land sub-divided into lots 60′ x 120′ and 80′ x 200′; that the 80′ x 200′ lots sold for $600.00 and 60′ x 120′ lots for $250.00 to $500.00; that after he sold this plot of land to Molina he decided not to sell any more plots by acreage. He further testified that the Creque and Cid lands are sandy bathing beaches, located on, and accessible to, the main highway running from the center of town west through the Bourne Field air base; that Parcel B herein is the site where the Naval officers homes are being built and Parcel C is just west of the airplane hanger; that these two sites are obviously suitable for building sites; that Parcels A, B and C are all desirable sites if one is interested in the beach. That Parcel A has the best beach of all. He further testified that the trend of property values all over the island of St. Thomas has been materially upward. That the demand for land has far exceeded the supply in St. Thomas; that the 236 acres which he sold to one Molina has no beach at all; that the entrance is not on the main highway, and that the road leading into the land was not

a paved, improved asphalt road, but was paved and improved after the sale of the land.

Witness Cyril Francois, called in behalf of the defendants, testified that he is a clerk in the St. Thomas Lumber and Trading Company; that he keeps books of their sale of land; that they own much land in St. Thomas and testified of the following sale: that they sold about ten acres of land to Svend Mylner about two years ago in an east inland valley; that it was rolling land about 500′ above sea level and grass pasture land; that the amount of the said sale was $2,500.00 for 12.5 acres or $200.00 per acre; that they also sold two acres of rolling land on the south side, on the main road, to one Rasmus Johansen for the sum of $500.00 or $250.00 an acre. He further testified that Mr. Lockhart sold one-quarter to one-third acre on the road leading to Bourne Field for $700.00 which is worth far less per acre than the land in question. He valued the beach land herein at $1,000.00 per acre in single acre plots. He also testified that the St. Thomas Lumber and Trading Company sold to District Attorney, James A. Bough, five acres of rolling land in 1940 for $1,000.00 about one and a half miles from town; that it is not overlooking the sea, has no beach, and no view of the sea, and that its elevation is about 1000 feet. He also testified that land values in St. Thomas are going up daily, and have gone up within the last year and a half.

Witness Joseph Sibilly, called in behalf of the defendants, testified that he is a merchant; that he buys and sells land; that he owns eight acres of land on the north on top of the mountain; that he sold six plots near Mafolie; four last year and two this year; that he does not sell by the acre, but by the plot; that each plot is approximately one acre; that he sold them at $200.00 each; one plot which consisted of three acres he sold for

$600.00. He states that he considers that as the fair market value. This witness was one of the appraisers of Lindbergh Bay; the other appraisers of that Lindberg Bay property were Harry E. Taylor, who is now the Administrator of St. Croix, and Donald Boreham who testified in this case, and Mr. Nichols of the Department of Agriculture, St. Thomas. Lindbergh Bay is otherwise known as Mosquito Bay and is now the Naval air base, known as Bourne Field. He further testified that prices at the time of its original purchase and prices of today are far different; that was in 1932, and that this property was then appraised at $40.00 per acre. It was appraised for government homestead sites for poor people. There was swamp there and that the land was adjacent to the swamp, and that this swamp has now been filled in entirely for the airfield.

Witness Louis Estornel, called for the defendants, testified that he is in the real estate business, that he started selling property in St. Thomas and has been an appraiser in probate cases in the District Court for the past fifteen years; that the section of land in question has a fine sandy beach; that he measured it, and the Cid property, Parcel A, has one thousand feet frontage on the main road and five hundred feet in the beach. That the main road is about forty feet from the beach. This land is considered suitable for subdividing; that 20 to 25 acres of Parcel A is suitable for subdivision and this portion subdivided was worth a total value of $9,600.00. There are a "lot of fruit trees" there and "plenty of guinea grass"; also a "lot of timber"; that he valued the remaining twenty acres at $3,000.00. This land had not been subdivided. He has not before subdivided any large plots similar to this one. The witness further testified that Parcels B and C are west of Bourne Field; and that part of Parcel C has a long shore line; that this parcel has less beach than

Parcel A, but Parcel B is a beautiful building site, so beautiful that the government itself has used it for Naval officers' homes; that Parcels B and C could be subdivided into suitable building lots. He valued the 23.4 acres, constituting Parcel C, at from $6,000.00 to $8,000.00, and if subdivided at $14,000.00. He states that Parcel B which is next to the golf course and consisting of 26.4 acres is rolling land; it is also suitable for subdividing into lots and he valued that parcel at $10,000.00 and, if subdivided, at $18,000.00 to $20,000.00 to $25,000.00 and as high as $30,000.00. He further testified that this parcel is next to the golf course and overlooking Bourne Field where all of the planes take off and is overlooking the sea on the south and from the top of the hill the view extends all the way to the island of Culebra, Puerto Rico. He also testified that one Orlando Baa purchased four lots in another location of approximately one acre each from witness Lockhart at $450.00 per acre and with $100.00 discount for four lots, or a total of $1,700.00.

Witness Ulysses Gimenez, called in behalf of the defendants, testified that he is a realtor, that he sold approximately two hundred lots in the last two years; that he has just sold the last one in his own subdivision known as Hassel Have which was subdivided into 200 lots. He claims 13 acres. The public surveyor says eight and one-half acres. It is under controversy. He paid $3,000.00 for the whole plot, at the north boundary of town. He testified that Parcel A was suitable for subdivision into lots; that a part could be divided into fifteen lots with about 100' frontage and about 1000' deep, that the value would then be $1,000.00 per lot, or $15,000.00. He states that 34 acres could be divided into lots; that six acres could be sold as forest land. He valued the whole 41.4 acres, comprising Parcel A, as of June 1941, at $15,390.00. He states that Parcel B is suitable for building purposes,

either residential or commercial. That Parcel C is also suitable for houses; that the Navy is putting up one building there now. He valued Parcel B at $500.00 per acre; Parcel C at $300.00 per acre. He states that he has been in the real estate business for thirty years, selling lots, land, and property.

Witness Leopold Barbel, called in behalf of the defendants, testified that he is a realtor and a property owner and has been in the business for about ten years; that this property is on the macadam road, the main road from town; that Parcel B is next to Lindbergh Bay, and next to the playground of the Marines; that Parcel C is on the south side of the road directly across from Parcel B; that Parcel B is very adaptable for building sites and easily accessible from the main highway; that the whole portion of Parcel C is adaptable for building; that it is much more hilly and rocky; that Parcel C has a small strip of beach, the rest lies in gravel. That he would consider the Creque land, either B or C, as being worth between $250.00 to $275.00 an acre. He valued Parcels A, B, and C, as a whole, between $250.00 to $275.00 an acre.

Witness Francois E. de Lagarde, called in behalf of the defendants, testified that he is a clerk; that Mosquito Bay was given out as homesteads to poor people and was bought by the government in 1934 at $60.00 an acre; that it was then bush land with a swamp nearby which swamp has now been filled in as a government airfield; that the swamp was about one-quarter of a mile from this land. He also states that prices have gone up considerably in the island; that he knows places which were formerly $60.00 per acre which cannot be purchased today for $100.00 an acre; that you cannot buy land in that vicinity by the acre regardless of price; that he lives in one of the homesteads adjacent to Bourne Field; that other than Mr. Cid's or Mr. Creque's land, and the gov-

24

ernment, there are no other owners of property there now.

Denzil Noll, called in behalf of the defendants, testified that he has lived in the Virgin Islands for twenty-four years. He was a former judge of the Police Court and now attorney for one of the defendants in this case. He testified that the Molina property of 236 acres, mentioned before, sold for $40,000.00 after being improved by a large house, garden, garage, and so forth; this price included the improvements, however.

The next witness called by the defendants was the District Attorney, James A. Bough, who testified that he is the District Attorney for the Virgin Islands; that he contracted to buy five acres of land at Charlotte Amalie about four miles east of town at $200.00 per acre; that it is surrounded by hills; that one can't see the town from there; that there is no view of the sea. He testified, however, that the property had sentimental value in that it was next door to one of his best friends. He also bought 2.2 acres at Estate Soldberg which has a magnificent view. It is 1.2 miles from town; you can see west, the harbor south, the town east, Viequez and El Yunke, and a portion of the sea east. That he bought this in July, 1941, and paid $300.00 for 2.2 acres. That it is 900' above sea level, and that it was purchased from Mr. Boschulte. He testified, however, that Mr. Boschulte will not sell land. He rents land at a very high price. Mr. Bough states that he thinks that the five acres which he bought for $200.00 an acre is actually worth $100.00 an acre.

Defendant Cid was called. He testified that he values Parcel A at $15,500.00. He states that Parcel A had 25 acres of guinea grass; that from this land he sold grass, cord wood, fence posts, and used wood to supply fuel for his town bakery, all of which was supplied from this land; that there is also a well on the land, eleven feet deep

25

which does not dry up at any time, and that he also sold sand and gravel from the land.

The next witness called in behalf of the defendants was defendant Creque who testified that Parcel B and Parcel C are both bounded by Bourne Field airbase; he valued Parcels B and C at $17,500.00. He states that he had a stone crusher on Parcel C which he values at $1,900.00; that there was a stone quarry on each parcel, one on B and one on C. That the quarry on Parcel B is red stone and rare in this island; that he expended two tons of dynamite in blasting this quarry; that the crusher was bought four years ago; the crusher, screens, stone oscillator, and so forth; that it would cost $100 to remove the crusher to the dock for old iron. That the motor of the crusher has not been in operation since 1938; that he has approximately three hundred tons of crushed rock still on the property.

Then, in behalf of the government, witness Lieut. Commander Robert C. Johnson, (C.E.C.) U.S.N., was called. He testified that he is the resident officer in charge of construction in St. Thomas; that he has been here for seventeen months; that he is in charge of all Navy construction in St. Thomas, and most of the land sales to the Navy have been made through him; that the amount deposited for these defendants was $5,907.00; that this was arrived at on the basis of the appraisal made by a Board appointed by the Governor, consisting of Mr. Donald S. Boreham, Captain Holmberg, U.S.M.C., and Mr. Nichols of the Department of Agriculture. He states that he thinks $5,907.00 represents a fair value for the total 91.4 acres, comprising A, B, and C. He states that before he came down to St. Thomas, seventeen months ago, either in 1938 or in 1939, the Navy bought 222 acres of Nisky land for the submarine base at approximately $74.00 per acre. That the Navy paid $16,500.00 for the 222 acres;

that the topography of this land purchased by the Navy is similar to Parcels B and C; that the Nisky property has protected water fronts in two bays which are known as Big and Little Krum Bay; that the Navy also purchased locations consisting of three low-cost housing lots in the homestead area, north of Brewer's Bay, from Mr. de Lagarde for $450.00 and consisting of three acres; that the Creque stone crusher was offered to the Navy by Creque for purchase, but the Navy refused it because they felt that the cost of repairing it to put it into operation would be more than the cost of a new one. He further testified that it cost the Navy about $200.00 to build wells similar to the one on Cid's property. He testified that Parcel B is very desirable for residential purposes; that Parcel C was very undesirable as it faces the Navy seaplane hangar, and planes warming up, making a terrific noise and flying all over Parcel C, that the Naval barracks is being built on Parcel C for men handling planes in order that they may be near their work. He further testified that a Mrs. Benjamin bought a lot from witness Lockhart of not much over one or one and one-half acres for $750.00. This plot is one-half mile north of the cemetery and three-quarters of a mile from town, on this same road. That Mark Hays, a private individual, who works with the contractors, purchased land on top of the mountain at approximately $150.00 per acre seven or eight weeks ago. Elevation about 1000 feet.

The next witness called in behalf of the government was E. Bindley. He stated that he paid $40,000.00 for the 238 acres of land aforementioned as previously sold by Lockhart to Molina and known as Estate Contant; that at the time of his purchase he considered the value as being about $20,000.00 for the buildings and improvements and about $20,000.00 for the 238 acres of land, or approximately $84.00 per acre. This was in December of 1940.

Witness Donald S. Boreham, called in behalf of the government, testified that he was born in St. Thomas; that he is the Commissioner of Public Works in St. Thomas, that he has been all the time in the employ of the Public Works for the past twenty or twenty-two years; that the Public Works handles all surveys, land records of surveys in the transfer of title to property; that he has also done a certain amount of appraising for the government and other persons; that he is an appraiser, he is the public surveyor, and was a member of the board appointed by the Governor to appraise this land. He testified that defendant Creque bought the stone crusher second-hand from a contractor who had used it and was finishing his job. That the stone crusher has not been used for a couple of years; he states that prices for which property sells in St. Thomas do not represent at all times the accurate market value; he says the value of land on Parcel A is $40.00 per acre; and the flat land $60.00 per acre, and the top at $75.00 per acre. The whole land of Parcel A is not as choice as some of Parcel B which is suitable for building sites; that the Creque land on Parcel B does not have as good a beach as Parcel A; that he owns a lot of one-half acre which he thinks is the best lot in the whole island, that he paid $35.00 for it; that it is near Mafolie's Church on the mountain; that he bought it about two years ago; he says that he did not consider the quarry in making his valuation; he did not value the property for building sites; that he only valued the parcels as complete country estates of land. He said: "We looked at it as country estates and so valued it." He states that Creque sold 16.5 acres at Lindbergh Bay to the Municipality in 1939 for $2,000.00; that three-quarters of it was a pond which has since been filled in for the runway of the air field; that Mr. Creque also gave another piece to the Navy; the pond was a salt

water lagoon. Witness Boreham also testified that he took into consideration in his valuation made above, that the whole of Mosquito Bay, five hundred acres, sold in 1932 for $2,000.00 for homestead sites for the poor; that Estate Contant of over 200 acres sold for around eleven hundred dollars; that Estate Charlotte Amalie of 450 acres sold in 1935 for $20,000.00 with "everything." (He apparently did not consider or did not know of the more recent resale of Contant in December of 1940 for land $20,000.00 and buildings $20,000.00).

Mr. Bough was recalled and testified that the valuation placed on the Encarnacion Vasquez property mentioned above was $4,000.00 and that the government paid $3,200.00 by agreement for the 15.71 acres. (This valuation per acre would be $254.00).

Mr. Creque was recalled and testified that 16.5 acres which he sold at $2,000.00 or $125.00 per acre was valued by him at $250.00 per acre, and that he agreed to sell it to the Municipal Government at half price so that they could give it to the Navy.

In addition to the foregoing evidence, witness Donald S. Boreham was recalled. He testified again as to his qualifications stating that he valued Parcel A as a whole; that his valuation of Parcel A was at $70.00 to $80.00 per acre as a whole. He then placed his valuation of the fifty acres, comprising B and C, taken as a whole, at $90.00 to $100.00 per acre. ($70.00 per acre for "A" would be $2,898.00; and $80.00 per acre $3,212.00). (Parcels B and C at $9.00 per acre, $4,500.00 and at $100.00 per acre, $5,000.00)..

Witness Ludvig Christensen, one of the commissioners appointed by the Court, and Cashier of the Virgin Islands National Bank, was then called in behalf of the defendants herein. He testified that he was the Cashier of the Virgin Islands National Bank; that he has been

29

Cashier of the bank since May 1, 1935; that part of his work as Cashier of the bank has been to value property in St. Thomas for the bank for mortgage purposes; that he has made over three hundred valuations of such properties; that the witness Donald Boreham has usually worked with him on many of the valuations; that he and witness Donald Boreham together have appraised over two hundred properties for the bank; that he is the official appraiser of properties and lands for the bank; that he values Parcel "A" as of June 14, 1941, at $6,148.00 as the fair market value of this land (which is an average valuation of $148.00 per acre, and that he values Parcels B and C as of June 14, 1941, at $7,610.00 as the fair market value (which is an average of $152.00 per acre). He also testified that Estate Contant mentioned before consisted of 238 acres and sold for $11,800.00 or approximately $50.00 per acre; that this estate was appraised by himself and Donald Boreham at $40,000.00 about two years later after the dwelling, garage, and other buildings had been erected; that their appraisal at that time, about December 1940, was approximately $20,000.00 for the buildings and $20,000.00 for the land or approximately $84.00 per acre for the 238 acre plot as a whole (that was the price for which the testimony shows it was resold); that Estate Contant has some advantages over this land and has some disadvantages. The land in this case is beach land, readily accessible to the main road leading from town. Contant consists of a parcel of 238 acres with no entrance on the main road and no beach; and these parcels are smaller. This witness further testified that usually Donald Boreham and himself were very close together on their appraisals. In response to a question asked him by the Court as to why he thought they were so far apart in this particular instance, he states that in making appraisals for the bank to make mort-

gages they must be very conservative in their appraisals and reserve all doubt in favor of a lower appraisal, and that he feels that Donald S. Boreham has used this same method of appraisal in this property, but that a consideration of its fair market value is quite different from a consideration of how much money the bank would loan upon it.

The record further shows from the testimony of witness Boreham, the sales of other plots of land in the far eastern end of the island, quite some distance from town, and in various size plots, to wit:

1. Estate Red Hook: Nazareth and Nadir sold in March, 1941, 710 acres for $5,000.00. He states, however, that the parcels in this case are superior land. That the best part of Estate Nazareth sold for $40.00 to $50.00 per acre; that the Creque land is admirable compared to it; that this land is better only in spots than Cid's; that it is about seven miles from town at the east end of the island. He also testified that an estate of Botany Bay consisting of 450 acres sold in 1938 for $2,500.00; there are no details of this land. He further testified that one Haverkamp purchased 26 acres at Magens Bay for $4,600.00 which included buildings valued at about $2,000.00. He states that the view of this Haverkamp land is as good as Creque's land. But the land is all hillside except where the house runs out on a little spur. ($2,600.00 for 26 acres would be $100.00 per acre). He further testified that Lockhart sold to one Hartman 20 acres of land back of West Indian Company's docks in June, 1940, for $1,700.00. This was pasture land in the middle of south side of the island and within one mile of town, but in a hollow back of West Indian Company's dock and runs toward Flag Hill, and it is comparatively very steep. It is not adaptable to building sites. He also testified that the Benjamin lot sold by Lockhart for

31

$750.00 is less than one acre — 7000 sq. ft. — that the price was exorbitant. He stated that in general, however, sales do represent market value. He further testified that $200.00 per acre is the standard price for land in the area of the Mylner property.

Leon Mawson, Secretary to the Judge of the Court and Court Reporter, was then called by the defendants. He testified that he purchased five acres of land in the east side of the island, 4.4 miles from town, at $1,250.00 or $250.00 per acre. That the land is very similar to this land in question. Both sides then rested and the matter was submitted to this court.

OPINION

■ All of the evidence, taken as a whole, indicates that there has definitely been a constant increase in the sale price of land in St. Thomas, and that the demand for land far exceeds the supply. It is also clear from this record that some of the witnesses have given fantastic and widely varying estimates of the value of land. I think this is due in part to the fact that St. Thomas is a very small island, only fourteen miles long and three and one-half miles wide at its widest point, and within that space the island rises to heights of about twelve hundred feet in many of the highest places; there are numerous bays and an irregular coast line; there are many hills that are very steep and there is a very small percentage of level land; it is therefore clear that there is not very much similar land in Saint Thomas. Most plots of land are different in character from most others. In addition, there is an apparent unwillingness on the part of owners of land here to dispose of land; and, as a consequence, there are not a large number of sales of vacant land in St. Thomas. It is difficult, therefore, to base market values upon customary sales be-

cause there is some difference in the character of the land in nearly every sale which distinguishes it from most others and, as a result, there is more of a tendency to make values by speculation rather than upon any sound bases. And while market valuations in this case have run all the way from the amount deposited by the government to market valuations far beyond the claim made by the defendants herein, it seems clear to the Court that the value of this land, made upon any sound bases of such market sales as there are available, is not in excess of that value placed by witness Ludvig Christensen, to wit: Parcel A at $6,148.00 and Parcels B and C at $7,610.00. This court has also considered very carefully all of the evidence given by witness Donald Boreham. This court is also of the opinion that the experience of both of these men, Ludvig Christensen and Donald Boreham, in over 200 appraisals for the Virgin Islands National Bank, should certainly place both of them among the best informed men in this island as to the true market value of lands and properties here. The Court has considered all of the evidence concerning subdivision of this property. There is no evidence in this record of any effort, plan, or intention to subdivide this land, neither is there any competent evidence, based upon actual fact and experience, indicating that these lots would sell if subdivided, except speculative opinion of some of the witnesses which this court does not feel is based upon sound facts, nor based upon the actual subdivision and sale of other similar plots. The only evidence introduced to that extent is that the land is adaptable to subdivision in the sense that it can be fenced off into lots and roadways levelled between the lots. Another element that is apparent from the record in this case is that some of the witnesses showed a definite reluctance in valuing land because of its influence upon the sale of their own

lands. It is quite clear that there runs through the testimony of many of the witnesses the fear that if they did not state that this land was of high market value, that it would affect prices which they wished to ask for other lands.

 Both sides have argued that larger plots are worth less per acre than smaller plots. The defense attorneys have suggested it in comparing Estate Contant of 238 acres with these plots of 41 and 50 acres respectively, and the government attorneys have argued it in comparing these plots with smaller ones of a few acres. The Court feels that it works both ways. That if other elements are equal these plots of 41 and 50 acres respectively would have a higher market value per acre than Estate Contant which sold for $50.00 per acre and resold for $84.00 per acre in December of 1940, and that likewise they would have a far smaller market value than the rest of that same estate some of which has since been sold in small lots up to $500.00 per lot, and far exceeding $500.00 per acre; and that likewise it would have a less market value than other parcels, even if similar in nature, which sold in plots of two, five or twelve acres each. When we add to all of these considerations the record which we have available here of recent sales, together with witness Donald Boreham's testimony that $200.00 is standard for land in the Mylner vicinity, together with the wide variations in testimony as to the desirability of various parcels and various portions of the island, it is the opinion of this court that $200.00 per acre normally represents a fair market value of choice suburban land in St. Thomas in plots of two to twelve acres. It is also the opinion of this court from all of the testimony herein that these plots in question, although choice in some respects, are not as choice or valuable in other respects as the most valuable land in

34

St. Thomas, and that as plots of 41 to 50 acres respectively, they should be valued overall at less than plots of two to twelve acres each. Witness Ludvig Christensen testified that plots of the size in question should be valued at about fifteen per cent less than smaller plots of a few acres. This would be an over-all valuation of $170.00 per acre for choice land in plots of 41 to 50 acres. These plots are located on that part of the island where its greatest development has taken place, near the Bourne Field air base and the surrounding development, and on the main paved road to town. Parcel A has a bathing beach of 500 feet and 1,000-feet frontage on the main road. The Navy is building homes for Naval officers on Parcel B, using it as building sites. The market value of land in St. Thomas has been steadily rising. Certainly, therefore, these plots have, in the islands greatest development area, kept pace, if not forged ahead of, the rise in values all over the island. Consequently, while from the point of desirability on the part of some home buyers seeking tranquility, this value might be below normal, its rise in importance from the other advantages aforementioned has been almost as great; and while its market value should not be overall as much as $170.00 per acre, the market value should not be considerably less. The disadvantages of its location seem to be practically compensated for by the advantages of its nearness to the islands greatest development, its beach and its accessibility from the main road to town. And although the government itself, in building the Bourne Field air base and other surrounding developments, has been a factor in enhancing the market value of these surrounding private properties, it is none the less a value which has inured to, and is then inherent in the surrounding land itself. Where one improves his own land with a large development, such as a theatre or other development, which conse-

quently results in the rise in value of nearby land belonging to others, he cannot thereby claim an interest or financial credit in that nearby land of others; nor can he, upon his decision to purchase that nearby land of others at the then market price, claim any right to a discount by the amount to which the improvement of his own land has enhanced the market value of other land. The thus inherent market value is one which the owner can rightfully expect from any purchaser. This applies equally in a condemnation proceeeding, for, except where the taking itself, of a part of certain land, either enhances or diminishes the value of the remainder, not taken, this court can only find the fair market value, which in the opinion of the Court was inherent in the land as of the date of its taking, to wit: June 14, 1941, and as of no other date, regardless of the factors which, prior to that date, may have contributed to the fair market value.

Witness Donald Boreham has valued Parcel A between $70.00 and $80.00 per acre; Parcels B and C between $90.00 and $100.00. Witness Ludvig Christensen has valued Parcel A as a whole at approximately $148.00 per acre; Parcels B and C, as a whole, at $152.00 an acre. It would therefore seem to the Court that the valuation placed by witness Ludvig Christensen more correctly represents the market value of this land than that valuation placed by witness Boreham, and the Court is inclined to feel that witness Ludvig Christensen's testimony as to the conservative nature of their valuation for bank mortgage purposes is the correct explanation of the different viewpoint in which these two appraisers made their appraisal. And while the Court does not give credence to many of the excessive valuations placed by some other witnesses, it is to be noted that in the record all witnesses called for the defendants, all of whom are men buying and selling, or dealing in land in

St. Thomas, have placed valuations in excess of that given by witness Ludvig Christensen.

After weighing all of the above-mentioned factors, together with the above record of available recent sales on the island of St. Thomas, this court is of the opinion that the fair market value of these parcels of land as of June 14, 1941 was as follows, to wit:

| | | |
|---|---|---|
| Parcel A | (41.4 acres) | $6,148.00 |
| Parcels B and C | (50 acres) | 7,610.00 |

■ This court is of the opinion that there is no merit in defendant Creque's claim for value of machinery and equipment on the said land which machinery and equipment had not been used for more than two years and had been allowed to deteriorate, and which machinery, and equipment he was apparently allowed to remove if he so desired. (There is no evidence that this machinery and equipment was a fixture taken with the land). The Court is further of the opinion that if he desires to remove the said machinery and equipment to some other place of his own choosing, that it must be at his own expense, and that it is not the government's obligation to pay for its removal. The Court is also of the opinion that any market value which might have attached to the aforesaid land by reason of the stone quarries thereon has been covered in the above opinion of the fair market value of each of the parcels stated above.

Further, with respect to the fees of the three commissioners required by statute, and which fees the statute also requires the Court to fix, as part of the costs of this proceeding■, the record shows that inspection of the properties, hearings, and the taking of evidence covered a total of approximately three and one-half days on the part of

the said commissioners; that thereafter they had consultations and made up and filed their report to the Court. The Court is, therefore, of the opinion that the reasonable fee to be fixed for the said three commissioners is $400.00 to be divided as follows: $150.00 to Mr. George H. T. Dudley, Chairman, and $125.00 each to the other two commissioners namely, Mr. Ludvig Christensen and Dr. Rudolph U. Lanclos.

Findings of fact and decree may be submitted in accordance with the foregoing opinion.